CLARENCE F. CURTIS AND HERMAN CURTIS, BY THEIR NEXT FRIEND ELISHA CALKINS v. JOHN L. BROWNELL.

*Mortgage set aside for insanity of mortgager.*

A mortgage made by a man who had been insane some time before and had periodical recurrences of insanity, and was insane at the time he gave the mortgage, though he had all along managed his own affairs with average correctness and had been treated by his neighbors as competent to do business even while they considered him of unsound mind, was set aside as being made while *non compos mentis*, though not so manifestly insane as to make the conduct of the mortgagee fraudulent in making the bargain which it was meant to secure, even though he had been given sufficient warning to put him on his guard.

Appeal from Macomb. Submitted October 16. Decided November 29.

BILL TO SET ASIDE a mortgage. Defendant appeals.

*Edgar Weeks* and *T. M. Crocker* for complainants. The opinions of those who speak from personal knowledge of a person are admissible to prove his insanity, Elwell's Med. Jur., 430; *Beaubien v. Cicotte*, 12 Mich., 503; *Rambler v. Tryon*, 7 S. & R., 90; *Grant v. Thompson*, 4 Conn., 203; *Dickinson v. Barber*, 9 Mass., 225; *Clark v. Fisher*, 1 Paige, 171; *Jacox v. Jacox*, 40 Mich., 473.

*Aug. C. Baldwin* for defendant. Mere weakness of intellect does not incapacitate one from making a contract, 2 Kent's Com., 453; *Att'y Gen. v. Parnther*, 3 Bro. Ch. R., 441; *Cram v. Cram*, 33 Vt., 15; *Jackson v. King*, 4 Cow., 207; *Farnam v. Brooks*, 9 Pick., 220; 1 Whart. & Stille's Med. Jur., §§ 1–13; but if advantage is taken of such weakness, and fraud is practiced on him, his contract is void, *Gartside v. Isherwood*, 1 Bro. Ch. R., 560; *Mann v. Betterly*, 21 Vt., 326; *Willis v. Jernegan*, 2 Atk., 251; *Stewart v. Lispenard*, 26 Wend., 254; *Osterhout v. Shoemaker*, 3 Hill, 513; 1 Story's Eq. Jur., §§

236-8; the distinction between weakness of mind and unsound mind is made in *Blanchard v. Nestle,* 3 Den., 37; where the defense of mental incapacity is made, the test is whether the party incapacitated could comprehend in a reasonable manner the nature of the affair in which he took part, *Somers v. Pumphrey,* 24 Ind., 231; *Dennett v. Dennett,* 44 N. H., 531; *Hovey v. Chase,* 52 Me., 316; *Staples v. Wellington,* 58 Me., 453; *Crouse v. Holman,* 19 Ind., 30; *Lilly v. Waggoner,* 27 Ill., 398; *Van Horn v. Keenan,* 28 Ill., 448; if one who is capable of taking care of his own interests, makes a bad or losing bargain, the law will not aid him unless deceit has been practiced against him, *Miller v. Craig,* 36 Ill., 109; *Baldwin v. Dunton,* 40 Ill., 188; *Clearwater v. Kimler,* 43 Ill., 276; *Emery v. Hoyt,* 46 Ill., 259; *Lindsey v. Lindsey,* 50 Ill., 79; *Wiley v. Ewalt,* 66 Ill., 26; *Carpenter v. Calvert,* 83 Ill., 63; *Stone v. Wilbern,* 83 Ill., 105.

CAMPBELL, C. J.    Complainants filed this bill to set aside a mortgage executed by their deceased father, Byron Curtis, to defendant for $1600, dated November 9, 1875, and covering a farm of 160 acres in Shelby, Macomb county.

The mortgage is attacked on the ground that the mortgagor was insane when it was executed.    It was given to secure the price of a set of mill machinery bought at that time of defendant, on which $200 deduction was to be made if paid within sixty days.

The court below granted the prayer of the bill, and defendant appealed.

The arguments of counsel dwell at some length on the rules of law applicable to such cases, but we do not think there is much occasion for discussing them.    The ground on which the decision must be made is narrow, and includes nothing but the single question of insanity. The testimony does not indicate any weakness short of that, on which the transaction could be avoided, unless for fraud.    We have discovered nothing in the record

which would show that any active fraud was practiced. The price, as usual in such cases, is placed by different, and so far as we discover, honest witnesses, at very varying rates, and the utmost that can be said is that it may have been higher than it was probably worth. But Curtis and not defendant was the active party in seeking to bring about the bargain, and the security he proposed to give was a third mortgage, although safe enough. If he was not insane, he had what he supposed to be sufficient reasons for buying it, even at a full price, and if his plans could have been carried out, there is reason to believe it would not have been so bad a bargain as would have excited surprise. His purpose was to put it in a mill, of which he already owned a half interest, and his brother Freeman Curtis had given him reason to believe he could have control of the whole, although he opposed this purchase, and refused to carry out his agreement, on the ground as he now claims, and with seeming truth, that he thought Byron was not in proper condition to carry it on. This purpose is not shown to have been an extravagant one, and so far as any ground but insanity is concerned, the subsequent conduct and failures could have no effect on Brownell's bargain. Unless Byron Curtis was actually insane, there is no case made out; and the rules concerning ordinary fraud have no application.

Upon the question of insanity the case presents many difficulties. As opposed to it we have very full evidence that Byron Curtis was not only engaged during all his life in business of one kind or another on his own account, but was also for many years before his death residing in the same place, as head of a family, managing his farm and some outside interests, and generally dealt with as any one else would be. And the case is further involved in doubt by the fact that he had always been a speculative and somewhat visionary character, who had been in the mining regions of the west, and whose exaggerations of business prospects and schemes

appeared much wilder in an old and sedate farming region than they would have seemed any where else. And the evidence warrants the idea that other members of his family, with less eccentric and extreme notions, had not shown much better judgment, and magnified many very insignificant things into undue importance.

Nevertheless there is evidence which has a decided bearing on insanity. We cannot profitably detail at length facts which to a large extent are of ambiguous meaning. It will be enough to refer generally to an outline of what seems to us to include the pertinent proofs.

The case shows that Byron Curtis—apart from his farm—had no considerable resources, and did business on a small scale. He owed some money secured by mortgage on his farm. There was nothing in his history or surroundings to warrant any large attempts or great expectations. And there was nothing in the situation of his property to lead to any reasonable belief that it would advance to a great importance. The laying out of the Air-line Railroad, while it might account for some wild expectations, was not, in the views of most men, likely to make great business centers in that neighborhood. Still this notion alone would not necessarily show insanity.

In 1872 the evidence is quite conclusive that he was unmistakably insane. Of this we think there is no room for doubt. And during this insanity he dwelt, among other things, upon absurd schemes of speculation which involved not only extravagant ideas of future prosperity, but delusions as to existing facts. The proof of insanity at that period does not rest upon these things alone or chiefly, but upon such mental and physical conditions as were manifest and open to no other explanation.

The schemes and projects which he talked of most when excited nearly all related to wealth and business in some form. His mind ran upon great improvements

to be made in the country and village neighborhoods where he was interested. He had periods of depression when he feared suffering from destitution, and other periods of exaltation. He expected by the aid of a mill to carry on an extensive business in making pianos and furniture from the lumber he sawed to supply the eastern markets. He meditated building a town on an adjacent farm, and building a church and large school. He thought he had invented• an. excavating machine which would bring him in a large sum of money from the government. He claimed to have parties to whom he could ship any amount of lumber, and to have a contract for the black walnut to be used in the State Capitol. He said there was $80,000 in Detroit which he could have. He talked of setting up a very large wood-yard in the village of Rochester, and actually attempted to make a contract for wood with one of his neighbors, who regarded him at the time as incompetent. He applied to a surveyor to survey a mill lot and a railroad branch running. to it a short time before he bought the machinery from Brownell, and the surveyor avoided it partly because he appeared wrong. At the same time Curtis repeated to him some of his plans, and told him he could command $80,000. After he bought the machinery and his brother refused to put it in the old mill, he made preparations and excavated a place for a new building under unusual circumstances, and was shown by the testimony to have testified surprise after some of the work had been done, as if had not before understood what was going on. In the ensuing spring he committed suicide under circumstances which had at least some tendency to show he was then insane. There were other items of conduct having some such tendency.

The facts enumerated may not have been conclusive in themselves, although some of them seem to be more than even any extravagant talker would be likely to indulge in unless somewhat off his balance. It is per-

haps possible if there was nothing in his appearance and demeanor to indicate mental disturbance, that he might have been indulging in talking largely for the mere sake of talking. But some of these things are too wild to be reconciled with his general conduct when sane, without stretching presumptions very far. . Nevertheless there was enough in the conduct of his friends to require scrutiny.

He had brothers and sisters in the neighborhood who were claimed by himself, and possibly by his wife, to have intermeddled unduly with his affairs. He had some business relations with them, and a mortgage was obtained by one of them for another member of the family during the period when he was subject to these delusions. This mortgage was a ten per cent mortgage given to take up mortgages held by other persons. It was a beneficial transaction to the mortgagee. We are not informed of the rate of interest on the other mortgages. There is no doubt at all that during the period from 1872 till just before his death in 1876 he was permitted to manage his own affairs, and did manage them with average correctness. It is also in evidence that his condition was not such as to impress strangers as amounting to insanity. We have had some difficulty in getting over this practical treatment, which would usually overcome the testimony of those who while so dealing, profess to have regarded a man as insane.

We think however that it is sufficiently explained. The proof is satisfactory that at the times when he was found speaking and acting extravagantly he was pale, haggard and unnaturally excited, and had the appearance of an insane man, and was believed to be insane by his family. These extravagances reappeared in about the same way at intervals, and during those attacks his mind reverted to the same subjects, or those which were similar. Once or twice his wife took measures to guard against mischief which he seemed likely to do to himself, but there is not much evidence that he was thought

dangerous to others. The family appear to have regarded him as more or less insane throughout, but as not enough so, except at detached periods, to interfere with his affairs. There is reason to think they were not far from the truth. The testimony of his wife gives a more complete and intelligible account than that of any one else, and if we assume, which we think we must, that he was completely insane in the early part of 1872, we cannot doubt that the recurrence in subsequent years of similar conduct was the manifestation of insanity. And it is not very important to consider or to conjecture whether insanity actually left him or was only milder during the periods of more rational behavior, inasmuch as the proofs of its existence at the very period of the Brownell bargain are unmistakable, and continued subsequently.

It is not surprising that his family acted as they did, as no necessity appeared to exist for interference, and the facts were such as might make any one hesitate to declare him insane. There were acts and conduct which we do not think it desirable to dwell upon, that may be explained better by the continuance of mental disturbance than in any other way. The case is not void of difficulty, but on a complete review of it we are satisfied that the view taken below was correct, and that Curtis was *non compos mentis* when he gave the mortgage. While it appears that Brownell had warning given which ought to have put him on his guard, we have not been satisfied that his conduct when he made the bargain was open to serious censure. It is nearly as much his misfortune as his fault.

The decree must be affirmed with costs.

The other Justices concurred.